DOUGLAS COUNTY ASSESSOR
*v.*
DEPARTMENT OF REVENUE
*and*
WILLAMETTE INDUSTRIES, INC.,
*Intervenor*
(TC 3424)

Paul E. Meyer, Assistant County Counsel, Douglas County, Roseburg, represented plaintiff.

No appearance by defendant.

Peter R. Jarvis and Norman J. Bruns, Stoel Rives Boley Jones & Grey, Portland, represented intervenor.

Decision for defendant rendered May 4, 1994.

**CARL N. BYERS, Judge.**

Plaintiff appeals from defendant's Opinion and Order Nos. 89-2986 and 89-3531 reducing the 1989 assessed value of a sawmill. Intervenor, successor in interest to the taxpayer Bohemia, Inc., seeks to further reduce the value. The parties agree on the value of the land, leaving only the value of the machinery and equipment, buildings and structures in issue.

FACTS

The subject property is a large sawmill in Gardiner, Oregon. The mill is located between Highway 101 and the

Umpqua River. Although the river makes the mill accessible by ocean-going barges, the dock is small and the river is too narrow and shallow for large ships to load and unload. The site is approximately 60 acres in a triangular shape. While the value of the land is not contested, its size, shape and location limits use of the improvements. For example, both the mill office and employee parking lot are located across Highway 101 and are reached by a pedestrian-covered walkway above the highway.

Although the origins of the subject mill are not entirely clear, the site has been used for wood processing for many years. In the late 1970's and early 1980's, International Paper (IP) owned the property. IP envisioned an integrated project containing a sawmill and a plywood plant adjacent to its pulp and paper mill. IP invested approximately $85,000,000 in creating state-of-the-art plants. However, economic forces in and outside the industry prevented the project from achieving its potential. A recession caused the closure of the plywood plant in 1984.[1] Even though Bohemia, Inc., (Bohemia) took over operation of the sawmill in February 1988, some integration remained between the pulp and paper mill and the sawmill. For example, the sawmill was designed to create a large amount of chips to supply to the pulp and paper mill and that arrangement continued. Also, the facilities shared steam supply, fire protection and other infrastructure.

The log processing area, containing the debarkers and cutoff saws, was designed to prepare logs for export as well as for processing into lumber. The mill has a large log mill as well as a small log mill, with all of the usual accompanying facilities such as the planer, sorting and drying areas. Some of the equipment and features were designed to accommodate the once-used plywood plant and the export log market. Plaintiff's appraiser believed these features made the property "especial property" not subject to valuation by the market approach. The court finds that while some of these features may be unusual, they are not so extensive as to prevent a fair comparison with other sawmills.

---

[1] As of the assessment date in issue, all that was left of the plywood plant was the building which was used for storage of lumber and equipment.

IP operated the mill for several years at a loss. After an accounting write-down and other changes to produce a "profit," it began to market the property among known players in the market. Bohemia was interested and, after some negotiating, the parties agreed upon a price of $14,700,000. However, IP determined that a sale of the mill would have adverse tax ramifications and proposed restructuring the transaction as a lease. On February 1, 1988, Bohemia and IP entered into two leases and Bohemia purchased rolling stock and three specified items for $535,000. Construed together, the leases provided for a $1,000,000 down payment, with quarterly lease payments of $627,500. The leases contained an option to purchase the property for a price of $9,000,000. The option was not exercisable before February 1, 1991, and not later than August 1, 1991.

After entering into the lease, Bohemia redesigned and modified the mill. The changes were completed by mid-1988 at a cost of $3,423,693. Bohemia operated the mill from 1988 to 1992. Some time in 1990, Willamette Industries purchased Bohemia. Willamette decided not to exercise the purchase option and surrendered possession of the plant to IP at the end of the four-year lease.

## ISSUE

The sole issue before the court is the true cash value of the machinery, equipment, buildings and structures as of January 1, 1989.

## PLAINTIFF'S APPRAISAL

Plaintiff's appraiser expressed his opinion that the true cash value as of the assessment date was $19,508,440. He based this opinion on an appraisal utilizing three approaches to value.

Using the sales comparison approach, he analyzed the sales of six comparable sawmills by determining a unit price per thousand board feet (mbf) of production. His analysis indicated the market would pay $98.86 per mbf of production and that the subject property had a productive capacity of 160,000 mbf, resulting in an indicated market value of $15,817,600. To this he added Bohemia's remodeling cost of $3,423,693 and a depreciated market value for the office

building of $609,782 for a total of $19,851,075. Due to the size of the adjustments and the emphasis on productive capacity, the appraiser did not have much confidence in this approach.

In analyzing comparable sales, the appraiser did not extract items not under appeal such as land, and failed to adjust the measured capacity based on whether a plant operated one or two shifts. Also, by adding a separate value for the office building, the appraiser assumes the sales of the comparable mills did not include office space. While some adjustment may be justified, addition of the total amount was not.

Plaintiff's appraiser had even less confidence in the income approach, calling it the "least reliable approach to valuing the subject property." Although Bohemia only operated the mill for approximately one year prior to the assessment date,[2] plaintiff's appraiser used the direct capitalization method to find an indicated value from that year's income. Starting with a total "net income" of $4,008,953 he subtracted an allocated portion of the general and administrative expenses of $1,099,847, leaving a net income of $2,909,106. A direct capitalization rate of 16.124 percent gave him an indicated value of $18,042,086. The appraiser also calculated a value for the office building based on a rental value of 52 cents per square foot and a direct capitalization rate of 10.5 percent. After deducting $57,225 for the value of the land, this method gave an indicated value of $932,617 for the office building. Thus, by the income approach, the appraiser found a total indicated value of $18,974,703.

Little weight can be given to this approach because there was no history on which to base an analysis of income. The appraiser acknowledged that the direct capitalization method was not the best method to use for a property such as this, but felt it was necessary because he had income data for only one year. In addition to an inadequate history and measure of income, the appraiser added the value of the office building, which assumes the mill can operate without an office. The appraiser also assumed there would be a market for such an office building in a town the size of Gardiner. No

---

[2] Since the mill was shut down for remodeling during 1988, it is questionable whether the calculated income for that year is reflective of the mill's normal operations.

evidence supported either assumption. In addition, the appraiser made no adjustment or deduction for working capital; the 10.77 return on capital used is equivalent to a bond rate, not an equity risk rate; and there was no adjustment made for income taxes.

Plaintiff's appraiser and his associates also performed a detailed cost approach. He used the replacement cost-used approach for most of the machinery and equipment. This approach estimates the cost of the mill by compiling the cost of functionally equivalent equipment on the used market and adding depreciated amounts for transportation, installation and wiring. The buildings, structures and yard improvements were valued primarily by replacement cost-new less depreciation.

Perhaps the most difficult and subjective elements of this approach is determining functional obsolescence and external obsolescence. Plaintiff's appraiser established a depreciated cost used for the computer system in the mill of $1,326,350. He used that amount as a surrogate measure for functional obsolescence by simply omitting that item from the value derived by use of the cost approach. He made no adjustment for economic obsolescence because he felt the industry was in an "upswing." After totaling the cost values derived by the approach for the machinery, equipment, building, structures and yard improvements, plaintiff's appraiser found an indicated value of $19,508,440.

Plaintiff's cost approach has a number of problems. First, no logical relationship was shown between true cash value of the computer system and any overall functional obsolescence. Second, the "upswing" in the industry was perceived by looking at only half of the industry statistics. Looking at all aspects of the industry, including timber prices and restrictions on timber sales, gives a different view. Finally, plaintiff's appraiser was not consistent in the values derived. For example, there are a number of 15-ton bridge cranes which plaintiff's appraiser showed at different amounts for the same kind of items.

## INTERVENOR'S APPRAISAL

Intervenor's appraiser also used the three approaches to value. In the sales comparison approach he found 36 mills had sold, none for more than $10 million. He

selected three sales which he deemed most comparable and related those sales to their reported capacities. He then applied his estimate of market price per mbf of capacity to the subject's reported capacity. Based on that analysis, the comparable sales gave a range of value for the subject property from $4,815,000 to $6,080,000, indicating a value somewhere around $5,200,000.

Intervenor's appraiser also performed a detailed cost approach, utilizing the replacement cost-used approach for machinery and equipment and replacement cost-new for buildings and structures. Overall, he applied a 30 percent good factor to most items. In addition, he calculated overall functional obsolescence which he found in the log storage and handling, manufacturing transfers, lumber storage and asbestos removal. He also estimated economic obsolescence based upon his market survey in the amount of $4,477,054. His estimate of economic obsolescence assumed that market price was roughly equivalent to assembled liquidation value. All of the above gave him an indicated value of $9,625,000 by the cost approach.

In the income approach, intervenor's appraiser used a discounted cash flow method. Although he had only one year's actual earnings, he projected earnings for five years, discounting each year to net present value. After calculating a terminal value for the assets, he deducted working capital. However, this resulted in a negative value.

As an alternate income approach, intervenor's appraiser calculated the net present value of the payments under the lease. In his view, Bohemia was paying more than a market rent. The net present value of the lease payments, less the value of the land, indicated a value for the subject property of $9,690,000. In this calculation, the appraiser ascribed no value to the option to purchase the property for $9,000,000.

Intervenor's lease income analysis is not an appropriate method for valuing property for ad valorem purposes.

"In fixing the true cash value of land for property tax purposes the effect of existing leases on the value to the owner is disregarded. The basis for such a principle is that the tax is levied upon the land and is a tax upon all the interest into which the land may be divided." *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 625, 478 P2d 393, 480 P2d 713 (1971).

Just as a taxpayer may not use below market lease payments to show a lower value, an appraiser may not use above market lease payments to show a higher value.

It is curious that the appraiser uses the lease but not the negotiated price. It is undisputed that IP and Bohemia struck a deal and agreed upon a purchase price of $14,700,000. The fact that the transaction was restructured as a lease to accommodate IP's tax needs does not detract from this evidence of value. As intervenor's calculations show, the leases incorporated the same economic values.

## CONCLUSION

■ Previous cases have indicated that, although an arm's-length transaction is not conclusive, it is "very persuasive" in determining the value of the subject property. *Kem v. Dept. of Rev.*, 267 Or 111, 514 P2d 1335 (1973). The price of $14,700,000, which was negotiated approximately 11 months before the assessment date, is persuasive evidence of value. As analyzed by intervenor's appraiser, the purchase price must be reduced for assets which are not part of the property under appeal and for equipment which was removed before the assessment date. These amounts are more than offset by the $3,414,146 Bohemia spent improving the sawmill. The court accepts intervenor's analysis and finds that the true cash value of the subject property as of January 1, 1989, was $15,200,000.

Intervenor's witnesses suggested that Bohemia was specially motivated to buy this property. Some of the reasons cited were that Bohemia had a long-time presence in this area, was knowledgeable with regard to people and transactions, had good contacts and wanted to keep others out of its "wood basket." However, all purchasers of lumber mills have motives that will probably be very similar. Bohemia's knowledge and experience in the area merely gives credence to the proposition that it knew an appropriate price to place upon the mill. Bohemia closed its old Lakeside mill not far away and viewed the subject as its replacement. The court finds that Bohemia did not have any special or extraordinary motivation or influence that would detract from the purchase price being an indication of the subject's value.

The court finds that a preponderance of the evidence establishes that the true cash value of the property under appeal as of January 1, 1989, was $15,200,000. Costs to neither party.